RAICH v. TRUAX et al.

(District Court, D. Arizona. January 7, 1915.)

No. E–9.

1. CONSTITUTIONAL LAW ⊕⊃275—"EQUAL PROTECTION OF THE LAW"—DISCRIMINATION AGAINST ALIENS.

The act of Arizona adopted November 3, 1914, by a vote of the people, section 1 of which provides that any company, corporation, partnership, or individual employing more than five workers at any one time, regardless of the kind or class of work, shall employ not less than 80 per cent. qualified electors or native-born citizens of the United States or some subdivision thereof, denies the "equal protection of the laws" to persons within the jurisdiction of the state, in violation of Const. U. S. Amend. 14, as aliens as well as citizens are entitled to the benefits of that amendment.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 830, 835, 839, 843–846; Dec. Dig. ⊕⊃275.

For other definitions, see Words and Phrases, First and Second Series, Equal Protection of the Law.]

2. MASTER AND SERVANT ⊕⊃11—REGULATIONS—EMPLOYMENT OF ALIENS.

Such statute is evidently not intended to be a regulation within the police powers of the state, and is not a valid exercise of police regulation.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. ⊕⊃11.]

3. EQUITY ⊕⊃97—PARTIES—SUING ON BEHALF OF ALL PARTIES INTERESTED.

A suit by an alien to restrain the enforcement of a state law requiring employers to employ not less than 80 per cent. qualified electors or native-born citizens, in which he alleged that his employer was willing and anxious to retain him in his employ, but that the Attorney General and county attorney threatened to prosecute the employer, was not an action in which plaintiff could sue on behalf of all others similarly situated, under equity rule 38 (198 Fed. xxix, 115 C. C. A. xxix), providing that, when the question is one of common or general interest to many persons, constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 257; Dec. Dig. ⊕⊃97.]

4. COURTS ⊚═326—UNITED STATES COURTS—JURISDICTION—AMOUNT IN CONTROVERSY.

Under the provision of Judicial Code (Act March 3, 1911, c. 231) § 24, 36 Stat. 1091 (Comp. St. 1913, § 991), giving the District Court jurisdiction of all suits authorized by law to be brought by any person to redress the deprivation under color of any state law of any right, privilege. or immunity secured by the Constitution of the United States, or any right secured by any law of the United States providing for equal rights of persons within the jurisdiction of the United States, the District Court had jurisdiction of an alien's suit to enjoin the enforcement of a state law requiring employers to employ at least 80 per cent. of qualified electors or native-born citizens, without regard to the amount in controversy.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 888; Dec. Dig. ⊚═326.]

5. INJUNCTION ⊚═85—UNCONSTITUTIONAL STATUTE—INADEQUACY OF REMEDY AT LAW.

Equity will enjoin the enforcement of an unconstitutional statute requiring employers to employ at least 80 per cent. qualified electors or native-born citizens, on behalf of an alien thereby discriminated against, as he has no other remedy, either by an action at law for damages, or in criminal proceedings which might be instituted against his employer, for the enforcement thereof, as he would not be a party to such a proceeding and could not be heard therein.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 155, 156; Dec. Dig. ⊚═85.]

6. COURTS ⊚═508—LEGAL PROCEEDINGS—CRIMINAL PROSECUTIONS.

While, as a general rule, a court of equity will not restrain the prosecution of criminal cases, where the United States District Court acquired jurisdiction of a suit to enjoin the enforcement of an unconstitutional state law, requiring employers to employ citizens in preference to aliens, before any criminal proceedings were instituted for the enforcement thereof, it would maintain its jurisdiction to the exclusion of criminal proceedings in the state courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1418–1423, 1425–1430; Dec. Dig. ⊚═508.]

7. COURTS ⊚═494—UNITED STATES COURTS—JURISDICTION—DECLINING JURISDICTION.

Where an alien elected to sue in the United States District Court to enjoin the enforcement of a state law requiring employers to employ citizens in preference to aliens on the ground that it violated the federal Constitution, it was the duty of that court to hear and determine the issues involved, and it could not refuse to do so in order that the determination of such questions should be left to the state courts, which had not passed upon the questions involved, and in which no proceeding or action involving such questions was pending when such suit was brought.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1355–1371; Dec. Dig. ⊚═494.]

In Equity. Suit by Mike Raich against William Truax, Sr., and others. On application for a temporary injunction pendente lite. Motion to dismiss bill denied, and application for injunction granted.

John H. Campbell, of Tucson, Ariz., and J. S. Williams and Edward J. Flanigan, both of Bisbee, Ariz., for complainant.

Wiley E. Jones, Atty. Gen. of Arizona, Leslie C. Hardy, Asst. Atty. Gen. of Arizona, and William B. Cleary, of Bisbee, Ariz., for respondents.

⊚═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before MORROW, Circuit Judge, and VAN FLEET and SAW-TELLE, District Judges.

SAWTELLE, District Judge. This is an application for a temporary injunction pendente lite to restrain the Attorney General of the state of Arizona and the county attorney of Cochise county, Ariz., from enforcing a law enacted by vote of the people of that state, under an initiative petition, on November 3, 1914, upon the ground that the law is in violation of the Constitution of the United States, and the hearing thereof is had under section 266 of the Judicial Code.

[1] The act in question is entitled:

"An act to protect the citizens of the United States in their employment against noncitizens of the United States, in Arizona, and to provide penalties and punishment for the violation thereof."

And section 1 thereof provides:

"Any company, corporation, partnership, association or individual who is, or may hereafter become an employer of more than five (5) workers at any one time, in the state of Arizona, regardless of kind or class of work, or sex of workers, shall employ not less than eighty per cent. qualified electors or native-born citizens of the United States or some sub-division thereof."

By section 2, violations of the act on the part of employers are made misdemeanors and punishable by fine of not less than $100 and imprisonment for not less than 30 days; and by section 3, any misrepresentation or false statement by an employé as to his or her nativity or citizenship is made punishable by a fine of not less than $100 and imprisonment for not less than 30 days. The employment of more than 20 per cent. of persons who are not qualified electors, or native-born citizens of the United States, or of some subdivision thereof, by an employer of labor who employs at any one time more than five persons, is not made an offense on the part of the alien so employed, and no penalty attaches to him in consequence of his employment.

The complainant alleges that he is a native and subject of the empire of Austria; that he is employed by the defendant Truax in a restaurant kept by the defendant Truax at Bisbee, Ariz.; that the defendant has in his employ more than five persons; that the said defendant is willing and anxious to retain the complainant in his employ, but that the Attorney General of the state of Arizona and the county attorney of said Cochise county threaten to prosecute the said defendant under the act aforesaid; that if the defendant Truax shall be compelled by prosecution under said act to discharge the complainant from his employ, he, the complainant, will suffer irreparable injury on account of his discharge; and that the act in question is violative of the rights of the complainant under the Constitution of the United States, in that it denies to him the equal protection of the laws which is guaranteed under the fourteenth amendment to all persons submitting themselves to the jurisdiction and laws of the United States, whether citizens or aliens.

On behalf of the state of Arizona, it is avowed by the Attorney General that the law in question will be enforced against all persons

within its borders and that it is a valid exercise of the police powers of the state.

We think that the act in question denies to the complainant the equal protection of the laws, and is therefore in violation of the fourteenth amendment to the Constitution of the United States, and is void. In the case of Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, the Supreme Court of the United States said:

"The fourteenth amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to *any person within its jurisdiction* the equal protection of the laws.' These provisions are universal in their application to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality, and the equal protection of the laws is a pledge of the protection of equal laws. * * * The fourteenth amendment was undoubtedly intended not only that there shoud be no arbitrary deprivation of life and liberty, or arbitrary spoliation of property, but that equal protection and security should be given to all under like circumstances in the enjoyment of their personal and civil rights; that all persons should be equally entitled to pursue their happiness and acquire and enjoy property; that they should have like access to the courts of the country for the protection of their persons and property, the prevention and redress of wrongs, and the enforcement of contracts; that no impediment should be interposed to the pursuits of any one, except as applied to the same pursuits by others under like circumstances; that no greater burdens should be laid upon one than are laid upon others in the same calling and condition; * * * and the rights of the complainant are not less, because they are aliens and subjects of the emperor of China."

The Constitution of California, adopted in 1879, contained a provision prohibiting any corporation from employing directly or indirectly any Chinese or Mongolians in any capacity, and the validity of this provision was attacked in the case of In re Tiburcio Parrott (C. C.) 1 Fed. 481, and the court there held:

"That the provision was in violation both of the Constitution and laws of the United States and the treaty between the United States and the empire of China."

And it added that:

"In our country, hostile and discriminating legislation by a state against persons of any class, sect, creed, or nation, in whatever form it may be expressed, is forbidden by the fourteenth amendment of the Constitution."

In the same case the opinion of Mr. Justice Swayne of the United States Supreme Court was quoted with approval that:

"Labor is property, and, as such, merits protection. The right to make it available is next in importance to the right of life and liberty. It lies, to a large extent, at the foundation of most other forms of property."

In the case of In re Ah Chong (C. C.) 2 Fed. 733, the constitutionality of a law enacted by the state of California prohibiting aliens who were incapable of becoming qualified electors from fishing in the waters of the state was called in question, and the law was declared to be in violation of the fourteenth amendment of the Constitution and void.

In the case of Fraser v. McConway & Torley Co., 82 Fed. 257, the United States Circuit Court for the District of Pennsylvania, in con-

struing an act of the assembly of the state of Pennsylvania, approved the 15th day of June, 1897 (P. L. 166), which provides:

"That all persons. firms, associations or corporations employing one or more foreign born unnaturalized male persons over twenty-one years of age within this commonwealth, shall be and are hereby taxed at the rate of three cents per day for each day each of such foreign born unnaturalized male persons may be employed, which tax shall be paid into the respective county treasuries; one-half of which tax to be distributed among the respective school districts of each county, in proportion to the number of schools in said districts; the other half of said tax shall be used by the proper county authorities for defraying the general expenses of the county government. * * * That all persons, firms, associations and corporations shall have the right to deduct the amount of the tax provided for in this act from the wages of any and all employés, for the use of the proper county and school district as aforesaid"

—said:

"The court is here called upon to consider whether these provisions of this act of assembly are in conflict with the Constitution or laws of the United States. The fourteenth amendment to the Constitution of the United States declares: 'Nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws,' * * * Congress has enforced the above-quoted provisions of the fourteenth amendment by legislation embodied in sections 1977 and 1979 of the Revised Statutes (Comp. St. 1913, §§ 3925, 3932). The former of these sections enacts: 'All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.' It will be perceived that this statute, following in this regard the constitutional provisions themselves, embraces within its protection, not citizens merely, but all 'persons' within the jurisdiction of the United States. The question of the extent of the application of these constitutional provisions with respect to persons was before the Supreme Court in Yick Wo v. Hopkins, 118 U. S. 356, 359, 6 Sup. Ct. 1064 [30 L. Ed. 220], and it was there decided that the guaranties of protection contained in the fourteenth amendment to the Constitution embraced subjects of the emperor of China residing in the state of California. * * * There can be no doubt that the fourteenth amendment embraces the case of the present plaintiff, who, although a' British subject, is, and since about April 27, 1893, has been, a resident of the state of Pennsylvania, and whose right to reside within the United States is secured to him by treaty between the United States and Great Britain. * * * The tax is of an unusual character, and is directed against and confined to a particular class of persons. Evidently the act is intended to hinder the employment of foreign-born unnaturalized male persons over 21 years of age. The act is hostile to and discriminates against such persons. It interposes to the pursuit by them of their lawful avocations obstacles to which others, under like circumstances, are not subjected. It imposes upon these persons burdens which are not laid upon others in the same calling and condition. The tax is an arbitrary deduction from the daily wages of a particular class of persons. Now, the equal protection of the laws declared by the fourteenth amendment to the Constitution secures to each person within the jurisdiction of a state exemption from any burdens or charges other than such as are equally laid upon all others under like circumstances."

In conclusion the court says:

"I am of opinion that the act of assembly of the state of Pennsylvania of June 15, 1897, here in question, is in conflict with the Constitution and laws

of the United States, and cannot be sustained. · The demurrer to the bill of complaint is therefore overruled."

Legislative enactments in several of the different states, limiting or restricting the rights of aliens therein have been tested in the state Supreme Courts and held to be violative of the fourteenth amendment to the Constitution of the United States and void.

In the case of State v. Montgomery, 97 Me. 192, 47 Atl. 165, 80 Am. St. Rep. 386, decided May 28, 1900, by the Supreme Judicial Court of Maine, the constitutionality of section 2, c. 298, of the Laws of 1889, as amended by chapters 282 and 306 of the Laws of 1893, was attacked. This statute relates to hawkers and peddlers; section 1 thereof prohibiting the peddling of certain named classes of goods and chattels until the peddler shall have procured a license to do so, and said section 2 providing that:

"The secretary of state shall grant a license" for peddling "to any citizen of the United States who files in his office a certificate signed by the mayor of a city, or by the majority of the selectmen of a town, stating to the best of their knowledge and belief that the applicant therein named is of good moral character; but such license shall be granted to no other person."

Under said section 2, it follows that a citizen could obtain a hawker's or peddler's license, but an alien could not. The court, in an opinion reflecting exhaustive research on the question of constitutionality of enactments of this ilk, and after citing numerous decisions in support of the court's opinion that legislation of this category is obnoxious to the fourteenth amendment to the Constitution of the United States, says:

"In the light of these interpretations of the fourteenth amendment, we are compelled to conclude that a statute which forbids peddling except under a license, and which provides that citizens of the United States may be licensed, and that aliens shall not be is a denial of the 'equal protection of the laws.' It is an unconstitutional discrimination against aliens. It does more than impose unequal burdens and charges upon the alien. It absolutely denies him the privilege of an occupation open to citizens, which is more than a discrimination in burdens. It does not permit the alien within our jurisdiction to pursue a business occupation, and to acquire and enjoy property on equal terms with the citizen. * * * Nor can this discrimination be sustained as a constitutional exercise of the police power of the state. It must be noticed that the discrimination is not against a class, as criminals, as paupers, as intemperate, as disqualified by character or habits, or as harmful to society, but against a class solely as aliens. Such a discrimination is forbidden."

In the case of Templar v. Michigan State Board of Examiners of Barbers, 131 Mich. 254, 90 N. W. 1058, 100 Am. St. Rep. 610, the Supreme Court of the state of Michigan held that Act No. 212, Pub. Acts 1899, par. 5, was repugnant to the fourteenth amendment to the Constitution of the United States as denying equal protection of the law in so far as it discriminates on account of citizenship. Said act provided for the examination and licensing of barbers. After designating various points upon which the applicant for the license is to be examined, etc., the act further provides that:

"No person so examined shall receive such certificate who at the time of such examination is an alien."

In that case the Attorney General contended that under the police power the Legislature was vested with the right of regulating the professions, trades, and callings, and that said paragraph 5 of said act, even if it should result in excluding aliens from privileges enjoyed by citizens, was still within the purview of the legitimate exercise of the police power. The court, in dealing with this contention, quoted the rule:

"When legislation applies to particular bodies or associations, imposing upon them additional liabilities and restrictions, under the police power of the state, which are not purely arbitrary, the law does not violate the equal protection clause of section 1 of the fourteenth amendment to the federal Constitution, if all persons brought under its influence are treated alike, under the same conditions and circumstances. But," said the court, "the difficulty with this enactment [meaning said Act No. 212] is that all persons brought under the influence of this legislation are not treated alike, under the same conditions and circumstances. Before the enactment of this statute the plaintiff had the undoubted right to ply his trade in Michigan. In the exercise of the police power the Legislature had the undoubted right to require, as a prerequisite to his plying his trade, that he submit to an examination. But had it the right to require citizenship? If it had the right to couple that with other requirements, it would have the same right to make that the only requirement. In other words, it would have the right to exclude alien labor wholly. * * * But in the present case the relator's business is in no way injurious to the morals, the health, or even the convenience of the community, provided only he has the requisite knowledge upon the subjects prescribed by the Legislature to practice his calling without endangering the health of his patrons. To hold that he is not entitled to practice this calling, because not a full citizen of the United States, is to deny to him rights which we think are preserved by the fourteenth amendment."

In Ex parte Case, 20 Idaho, 128, 116 Pac. 1037, it was held by the Supreme Court of the state of Idaho that section 1458 of the Revised Codes of Idaho is repugnant to the Constitution and laws of the United States and void. Said section 1458 provides:

"It shall hereafter be unlawful for any county government, or municipal or private corporation organized under the laws of the state or organized under the laws of another state or territory or in a foreign county and doing business in this state, to give employment in any way to any alien who has failed, neglected or refused, prior to the time such employment is given, to become naturalized or to declare his intention to become a citizen of the United States."

In that case the complaint charged that petitioner, the superintendent of a private corporation, "knowingly gave employment to four aliens, regardless of the character of the work upon which they were employed." After citing the cases of Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, supra, Fraser v. McConway (C. C.) 82 Fed. 257, supra, and In re Tiburcio Parrott (C. C.) 1 Fed. 481, in support of the doctrine that:

"All persons within the territorial jurisdiction of the United States are within the protection of the fourteenth amendment of the Constitution, without regard to differences of race, color, or nationality"

—the court said:

"A state Legislature, by legislative enactment or otherwise, has no authority to deprive a person of the right to labor at any legitimate business or to deny any person within the jurisdiction of the United States the equal

protection of the laws, or to prohibit a corporation that has a right to do business in the state to employ any person, whether alien or native, in the prosecution of any legitimate business."

In Ex parte Kuback, 85 Cal. 274, 24 Pac. 737, 9 L. R. A. 482, 20 Am. St. Rep. 226, the unconstitutionality of the so-called "eight-hour" ordinance, which had been adopted by the city of Los Angeles, Cal., was determined by the Supreme Court of California. Section 3 of said ordinance provided that:

"It shall be unlawful for any contractor by himself or through another, when having labor performed under any contract with the city, to employ Chinese labor thereon."

In referring to this ordinance, the court used this language:

"It is claimed in support of the petition that this ordinance was unconstitutional and void. We think this objection is well taken. It is simply an attempt to prevent certain parties from employing others in a lawful business and paying them for their services, and is a direct infringement of the right of such persons to make and enforce their contracts."

In the case of City of Chicago v. Hulbert et al., 205 Ill. 346, 68 N. E. 786, the question of constitutionality was raised against Hurd's Rev. St. 1901, p. 141, c. 6, par. 10, which provides that:

"It shall be unlawful for any * * * officer * * * acting for * * * any * * * city * * * or any contractor, or subcontractor, under any or either of said municipalities, to employ any person or persons, other than native-born or naturalized citizens, or those who have in good faith declared their intentions to become citizens of the United States, when such employés are to be paid, in whole or in part, directly or indirectly, out of any funds raised by taxation."

The Supreme Court of Illinois in that case, holding said chapter 6, par. 10, unconstitutional, speaking through Justice Ricks, said:

"A similar law was enacted by ordinance in the city of Chicago, and we have repeatedly held that such law is invalid, as it is in contravention of the Constitution and the right of individuals to contract. The statute in question is void upon the same grounds, and neither the city nor the contractor was under any obligation to observe it."

So, also, in the case of People v. Warren, 13 Misc. Rep. 615, 34 N. Y. Supp. 942, Laws 1870, c. 385, par. 2, as amended by Laws 1894, c. 622, which made it a crime for a contractor with a municipal corporation for the construction of public works to employ an alien as laborer on said works, was held to be void on the grounds, among others, that it was violative of the treaty between the United States and the king of Italy, which provides that Italians resident in the United States shall enjoy the same rights and privileges as are secured to our own citizens, and that it was abrogative of rights, privileges, and immunities guaranteed by the fourteenth amendment to the Constitution of the United States.

[2] The discrimination against aliens wrought by the said act cannot be upheld as valid on the ground that it is a valid exercise of police regulation. Judge Cooley, in his work on Constitutional Limitations. (5th Ed. p. 745), in comprehensive yet succinct language, covers the entire domain of this particular contention. He says:

"The general rule undoubtedly is that any person is at liberty to pursue any lawful calling, and to do so in his own way, not encroaching upon the rights of others. This right cannot be taken away. It is not competent, therefore, to forbid any person, or class of persons, whether citizens or resident aliens, offering their services in lawful business, or to subject others to penalties for employing them. But here, as elsewhere, it is proper to recognize the distinctions that exist in the nature of things, and under some circumstances to inhibit employments to some one class by leaving them open to others. Some employments, for example, may be admissible for males and improper for females, and regulations recognizing the impropriety and forbidding women engaging in them would be open to no reasonable objection. The same is true of young children, whose employment in mines and manufactories is commonly, and ought always to be, regulated. And some employments, in which integrity is of vital importance, it may be proper to treat as privileges merely, and to refuse the license to follow them to any who are not reputable."

The case of People of the State of New York v. Crane, 150 N. Y. Supp. 933, decided by the Supreme Court, Appellate Division, of the state of New York, in December, 1914, not yet officially reported, involved the validity of that portion of section 14 of the Labor Law of said state (Consol. Laws, c. 31) which is as follows:

"In the construction of public works by the state or a municipality, or by persons contracting with the state or such municipality, only citizens of the United States shall be employed; and in all cases where laborers are employed on any such public work, preference shall be given to citizens of the state of New York"

—a violation of which act is made a misdemeanor. In that case the court said:

"The appellant, Clarence A. Crane, was convicted of a misdemeanor for violation of the statute, in that he employed aliens as laborers in the performance of a contract executed by the president of the borough of Manhattan for the construction of a catch-basin in connection with the public sewer system. * * * The particular provision of the act above quoted which has been discussed at bar is that which forbids the employment by persons engaged in the performance of work, under contracts with the state or a municipality, of any except citizens of the United States, and it is that feature of the act to which we shall direct our attention, and we shall commence our discussion by conceding, as is strongly urged upon us by the respondents, that the invalidity of an act of the Legislature is not to be lightly declared, and that, in order to find such an act invalid upon constitutional grounds, some definite provision must be found in the fundamental and paramount law with which the questioned enactment is at variance. The specific constitutional provision which is claimed to have been violated by the act in question is that portion of the fourteenth amendment of the Constitution of the United States which reads as follows: 'No state shall make or enforce any law which shall abridge the privileges and immunities of the citizens of the United States, nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' It is settled law that the amendment is not confined to the protection of citizens, but that its provisions are universal in their application to all persons within the territorial jurisdiction, without regard to any difference of race, or color, or of nationality, and the promise of equal protection of the laws is equivalent to a pledge of the protection of equal laws. Yick Wo v. Hopkins, 118 U. S. 369 [6 Sup. Ct. 1064, 30 L. Ed. 220]. The rights thus secured to resident aliens, as well as to citizens, have been repeatedly held to extend to the right to contract, to pursue lawful callings, and to follow ordinary avocations, that no impediments should be interposed to the pursuits of any one, except such as

are applied to the same pursuits by others under like circumstances. Barbier v. Connolly, 113 U. S. 27 [5 Sup. Ct. 357, 28 L. Ed. 923]. It was said by the same court in Missouri v. Lewis (101 U. S. 22 [25 L. Ed. 989]) that: 'No person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances.' And again in Hayes v. Missouri, 120 U. S. 68 [7 Sup. Ct. 350, 30 L. Ed. 578]: 'The fourteenth amendment * * * requires that all persons' subject to legislation limited as to the objects to which it is directed, or by the territory within which it is to operate, 'shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the limitations imposed.' Hence it may be said to be as firmly established as is any principle of constitutional law that one of the purposes and effects of the fourteenth amendment of the federal Constitution was to forbid discrimination by any state between citizens and resident aliens, based solely upon the fact of alienage and nonalienage, so far as concerns the right to enjoy life, liberty, and the pursuit of happiness and the equal protection of the laws. Among the rights guaranteed to every individual is that of freely contracting to render service and perform labor. 'The provisions of the state and of the federal Constitutions protect every citizen in the right to pursue any lawful employment in a lawful manner. He enjoys the uttermost freedom to pursue his chosen pursuit, and any arbitrary distinction against, or deprivation of, that freedom by the Legislature is an invasion of the constitutional guaranty.' People v. Williams, 189 N. Y. 131 [81 N. E. 778, 12 L. R. A. (N. S.) 1130, 121 Am. St. Rep. 854, 12 Ann. Cas. 798]. That the statutory provision now under consideration is frankly and baldly discriminatory requires no argument to establish. It forbids the employment of aliens upon all public works within the state, for no other reason than that they are aliens. On its face it appears to be directly in conflict with the fourteenth amendment. * * * It is sought to sustain the act as an exercise by the state of the police power—that well-recognized but not easily defined power under which the state may and often does restrict the liberty of the individual for the safety and protection of the community. It is not easy, nor is it necessary, to attempt to precisely define the scope and limitations of the police power, but it may be said generally to authorize such enactments as are deemed necessary for the protection of society and to guard its morals, safety, health, and good order; but it is well recognized that, in order to justify an act as an exercise of the police power, there must appear to be some obvious and real connection between the terms of the enactment and some of the purposes for the attainment of which the police power may be exercised. Consequently an act which invades personal rights or private property cannot be justified under the police power, unless there be some discernible relation between it and some legitimate object of police regulation. Whether or not any statute can be upheld as a valid exercise of the police power is also a proper subject for judicial inquiry. It was said in Colon v. Lisk, 153 N. Y. 188 [47 N. E. 302, 60 Am. St. Rep. 609]: 'The Legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business or impose unusual or unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police power is not final or conclusive, but is subject to the supervision of the courts.' Lawton v. Steele, 152 U. S. 133, 137 [14 Sup. Ct. 499, 38 L. Ed. 385]. * * * It seems to be quite clear that the provision of the Labor Law now under consideration cannot be upheld on this ground. * * * We have heard and considered various arguments dealing with the sociological aspects of the case, and others dealing with somewhat far-fetched suppositions as to the dire results that might be expected from the employment of aliens in constructing the subways in case this country should ever, unhappily, be engaged in war' with some foreign country. Such arguments, in our opinion, afford no assistance in the solution of what is purely a legal question. Our conclusion, therefore, is that the provisions of section 14 of the Labor Law, quoted earlier in this opinion, are violative of the fourteenth amendment of the Constitution of the United States, and therefore void. Our attention has been called to the text of numerous treaties between the United States and

foreign countries which, as it is claimed, expressly forbid discriminating legislation of this character. In view of the conclusion we have reached upon the constitutional question, it is unnecessary to discuss any question arising under these treaties. * * * It seems to be conceded by all of the respondents that it would be incompetent for the Legislature to impose upon private persons or corporations, not engaged in performing public work, such restrictions as are attempted to be imposed upon the city of New York as an arm of the state."

In this case the judgment of conviction against the defendant Crane was reversed, and the defendant discharged.

In the case at bar the law in question is evidently not intended to be, and is not, a regulation within the police powers of the state. If, under the guise of enacting a police regulation, the state can prohibit an employer from hiring more than 20 per cent. of alien laborers, it can prohibit the employment of 5 per cent., and if it can prohibit the employment of more than 5 per cent. aliens it can prohibit the employment of any aliens at all, and thus, under the guise of enacting a police regulation, nullify the fourteenth amendment to the Constitution of the United States as interpreted by the Supreme Court of the United States.

[3] The bill is filed by the complainant in his own behalf and on behalf of all others similarly situated, under equity rule 38 (198 Fed. xxix, 115 C. C. A. xxix), providing that:

"When the question is one of common or general interest to many persons, constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole."

But, manifestly, this rule does not apply to the case at bar, and therefore, under the facts stated in the bill, complainant cannot invoke this rule to sue as representing a class. As was recently said by the Supreme Court of the United States in the case of McCabe v. A., T. & S. F. Ry. Co., 235 U. S. 151, 35 Sup. Ct. 69, 59 L. Ed. ——:

"The complainant cannot succeed because some one else may be hurt. Nor does it make any difference that other persons, who may be injured, are of the same race or occupation. It is the fact, clearly established, of injury to the complainant—not to others—which justifies judicial intervention."

See, also, Scott v. Donald, 165 U. S. 107, 17 Sup. Ct. 262, 41 L. Ed. 648, and Engel v. O'Malley, 219 U. S. 128, 31 Sup. Ct. 190, 55 L. Ed. 128.

[4] Under section 24 of the Judicial Code, and the rule laid down by Judge Morrow in the case of Simpson et al. v. Geary et al. (D. C.) 204 Fed. 507, we hold an allegation of the amount in controversy is not necessary to give this court jurisdiction in this case.

[5] We think the position taken by respondents that the institution of a criminal proceeding against the respondent Truax in the state courts will afford ample means of determining judicially the rights of the complainant in the case at bar is untenable. The complainant is not a party to any such criminal proceeding, nor can he be made a party thereto; nor can he be heard therein, nor can he be in any legal sense secure, or require that his legal rights be determined therein. If he cannot secure his legal rights in a court of equity, he cannot secure them at all; for he is powerless to secure them in any legal proceedings that have been or can be instituted under this law, and he cannot secure

them in any action at law for damages. It cannot be successfully contended that he has no legal rights. It is axiomatic that every man within the territorial jurisdiction is entitled to his day in court. This complainant can have no day in court, save in a court of equity.

[6] The general doctrine that a court of equity will not restrain the prosecution of criminal cases is well settled, but it is subject to the exception laid down in Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764, that:

"When such an indictment or proceeding is brought to enforce an alleged unconstitutional statute, which is the subject-matter of inquiry in a suit already pending in a federal court,. the latter court, having first obtained jurisdiction over the subject-matter, has the right, in both civil and criminal cases, to hold and maintain such jurisdiction, to the exclusion of all other courts, until its duty is fully performed."

"It would seem that, if there were jurisdiction in a court of equity to enjoin the invasion of property rights through the instrumentality of an unconstitutional law, that jurisdiction would not be ousted by the fact that the state had chosen to assert its powers to enforce such law by indictment or other criminal proceedings." Davis v. Los Angeles, 189 U. S. 207–218, 23 Sup. Ct. 498, 500 (47 L. Ed. 778).

The Circuit Court of Appeals of the Ninth Circuit has also held that a court of equity has jurisdiction of a suit to enjoin the enforcement of a statute which affects property rights, although its violation is punishable as a criminal offense. Little v. Tanner, 208 Fed. 605–609.

In the case at bar the court acquired jurisdiction before any criminal proceedings were instituted against the defendant Truax, and should under the rule in Ex parte Young, supra, maintain its jurisdiction to the exclusion of all criminal proceedings instituted against Truax in the state courts.

[7] Counsel for respondents have urged with some emphasis that this cause should not be heard before this tribunal, but that the interpretation and determination of the questions involved should be left to the state courts. In this connection it is pertinent to observe that this case involves the construction of a law enacted by vote of the people of the state of Arizona, and that at the time of the filing of the bill herein the Supreme Court of the state had not passed upon or construed the law, nor was there pending in any court of said state any proceeding or action involving the validity of the same. In Burges v. Seligman, 107 U. S. 20–33, 2 Sup. Ct. 10, 21 (27 L. Ed. 359), the Supreme Court said:

"The federal courts have an independent jurisdiction in the administration of state laws, co-ordinate with, and not subordinate to, that of the state courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. The existence of two co-ordinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient, but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that by the course of their decisions certain rules are established which become rules of property and action in the state, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of state Constitutions and statutes. Such established rules are always regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But where the law has not been thus settled, it is the right and duty of the federal courts to exercise their

own judgment, as they always do in reference to the doctrines of commercial law and general jurisprudence. So when contracts and transactions have been entered into, and rights have accrued thereon, under a particular state of the decisions, or when there has been no decision, of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued."

It cannot be gainsaid that this complainant had the right of election of a forum in which to have his rights adjudicated. Having elected to bring his cause before this tribunal, it is the duty of this court to hear the application and determine the issues involved. The rule to be followed by the federal courts in cases of this character is clearly laid down by the Supreme Court of the. United States in the case of Cohens v. Virginia, 19 U. S. (6 Wheat.) 264–403 (5 L. Ed. 257):

"It is most true that this court will not take jurisdiction, if it should not; but it is equally true that it must take jurisdiction, if it should. The judiciary cannot, as the Legislature may, avoid a measure, because it approaches the confines of the Constitution. We cannot pass it by, because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur, which we would gladly avoid; but we cannot avoid them. All we can do is to exercise our best judgment, and conscientiously to perform our duty."

For these reasons, the motion to dismiss this bill is denied, and the application for an interlocutory injunction is granted.